UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW MOORE,

    Plaintiff,                           CIV. NO. 15-10997

    v.                                  HON. TERRENCE G. BERG

DEFENDER HOME SECURITY
COMPANY,

    Defendant.
_____/

**OPINION AND ORDER DENYING DEFEDANT'S
MOTION FOR SUMMARY JUDGMENT (DKT. 22)**

    This is an employment discrimination case, brought under the Family and Medical Leave Act, the American's with Disabilities Act, and Michigan's Persons with Disabilities Civil Rights Act. Plaintiff Matthew Moore ("Plaintiff") generally alleges that Defendant Defender Home Security Company ("Defendant") constructively discharged him by demoting him in response to his request for medical leave needed to address a serious back injury, and also discriminated against him because of a disability. Defendant filed a motion for summary judgment (Dkt. 22)

    For the reasons set forth below, the Court finds that genuine issues of material fact exist in this case. Thus, Defendant's motion for summary judgment (Dkt. 22) is **DENIED**.

## I. BACKGROUND

Defendant markets, sells and installs residential and small business security systems. On February 3, 2007, Plaintiff was hired by Defendant as a Security Technician (Dkt. 22, Ex. A, Plaintiff's Depo. at 77-78). Plaintiff was later promoted to Installation Manager and, on January 5, 2011, promoted again to Regional Director of Operations – Northeast (*Id.* at 117). Plaintiff's job title later changed to Regional Manager overseeing the "Great Lakes" region (*Id.*).

The events that gave rise to this litigation began when, according to Defendant, Plaintiff's job performance began to decline in early 2014. On February 13, 2014, Plaintiff's new supervisor Chris Evers[1] (Regional Director of Field Services) emailed all the Regional Managers under his supervision, including Plaintiff, the following message:

> There is a lot of concern around the snapshot rate and the increasing number of regions missing primary and minimum. I am new to the party, so I am still trying to dig into this. We all know that install rate is the most important KPI over everything else, so there is valid cause for concern. See attachment for more info.
>
> How has this number slipped away? Have we focused on Pulse, TP, and Cameras so much that we have taken our attention off of install rate? The increased profits we realize from Pulse and TP have been neutralized by the decline in snapshot. At this rate, we stand to lose almost 2800 installs and $3 million in profit this year by not achieving primary snapshot.
>
> Pat wants to discuss this on the call tomorrow, so I would like each of you to email me and let me know what you are doing in your region to address this issue before tomorrow morning so I can review first thing in the morning. We

---

[1] Evers began supervising Plaintiff in February 2014 (Dkt. 22; Ex. H, Evers Dep. at 151).

have to get back to the mentality that every job goes in! (Dkt. 22; Ex. D, 2/13/14 Email Thread, pp. 1-2).

Plaintiff responded to this email as follows:

Currently I am working hard to hold my guys accountable to the daily SM notes required for all cancels and reschedules. This includes following up with SM's on installs that I believe we should have saved . . . furthermore, we embrace the 5 points of contact as process and I'm also making sure that all new PIP's properly address failing snapshot as well. I'm also communicating sales coaching opportunities to our leadership team whenever possible. I'm sure there is more I can do to help this metric and am looking forward to hearing some of the best practices shared through this upcoming discussion. (Dkt. 22; Ex. D).

Then, Evers replied to Plaintiff:

Thanks Matt, that's a little too vague for me.

By 10 am tomorrow I would like you to send me the branches in your region that have concerning snapshot rates and what you are specifically going to work on with each of those SMs. For example — Pittsburgh and Cleveland are tanking this month. What is causing this and how are you addressing it? (Dkt. 22; Ex. D).

Defendant claims that Plaintiff responded to this email at 10:04 a.m. the following day.

Defendant claims that Plaintiff's performance continued to be problematic through May 2014. On May 6, 2014, Evers emailed Plaintiff and noted: "Currently 63% of your SAs are missing on at least 2 (or all 3) metrics and 20% are hitting primary or better on at least 2 (or all 3) metrics. As a follow up to our discussion earlier today, I want to give you this as a tool to help you identify the biggest opportunities" (Dkt. 22; Ex. F, 5/6/2014 Email from Evers). Plaintiff disputes that this email reflected negatively on his performance, and testified that – in conjunction with this email – he and Evers discussed options, but that Evers "didn't

3

want to pursue [a Performance Improvement Plan (PIP)] at that time. He [Evers] wanted to see how I performed in that month before we considered that route [i.e., a PIP]" (Dkt. 22, Ex. 1 at 22).

On May 13, 2014, Evers emailed Plaintiff asking what happened when his region again had poor performance, and Plaintiff responded: "I have a gut feeling I have to investigate in Cleveland. I have to gather some data and conduct a scheduled meeting with Chad tomorrow at 11 am. I'll send you an update on my findings tomorrow afternoon!" (Dkt. 22; Ex. G, 5/13/2014 Email Thread). Evers responded: "That doesn't answer what happened yesterday. You lost 15 jobs and I'd expect a better answer than that considering I asked the question 10 hours ago" (Dkt. 22; Ex. G).

Plaintiff testified that he and Evers also discussed Plaintiff's performance in May 2014 on the telephone:

> The beginning of May, I got a phone call from Mr. Evers concerning my — my performance. It was with — I was in Cleveland with my manager Chad Householder, and Mr. Evers called me and what amounted to approximately 20, 30 minute conversation where we dove deep into his concerns in my performance...
>
> . . . And this was the first time Chris had pointed out to me, and had actually on that phone call threatened me with a performance improvement plan — well, if I recall properly, it was something to the tune of, Mr. Moore, do you know you're eligible for a performance improvement plan? And after reviewing that with him, I agreed, yeah, okay, I am (Dkt. 22; Ex. A at 22).

Plaintiff disputes that his performance was deficient, especially as compared to similarly situated Regional Managers. Plaintiff contends that his peers (the other Regional Managers supervised by Evers) actually had worse performance

4

records on the sales metrics that Evers claimed were important than Plaintiff did. Specifically, Plaintiff points to the data for Evers' entire "Green Territory" (Dkt. 25; Ex. 5). Plaintiff controlled Great Lakes, which he contends outpaced other regions on various "Key Indicators" in February, March, April, and May 2014 (every month Evers oversaw him). For example, in March 2014, Plaintiff's Great Lakes region did better than the North Texas and Northern California regions on 3 out of 4 metrics (*Id.*). As will be seen, the Regional Managers in those two territories were retained and coached, while Plaintiff was demoted.

Plaintiff has produced evidence that other Regional Managers received written coaching by Evers (Dkt. 25; Exs. 6-8). However, Evers testified that he, "did not issue any coaching or disciplinary documents" to Moore before removing him from his position (Dkt. 25; Ex. 9) (Dkt. 22; Ex. A at 72, 341, 342). Plaintiff likewise said that Evers did not deliver "a single, document, a single write-up, a single verbal warning a single written warning or anything of the sort in writing saying my performance was a concern." *Id.* Indeed, other than Plaintiff, Defendant cannot identify a single Regional Manager who was removed from his or her position without first being given the opportunity to complete a Performance Improvement Plan (PIP) (Dkt. 22; Ex. H, Evers Dep. at 102).

Plaintiff testified that he has suffered from "back issues" since 2008 (Dkt. 22; Ex. 1 at 29). In April 2014, Evers permitted Plaintiff to work from home when his back pain unexpectedly flared (Dkt. 22; Ex. A at 230). Plaintiff stated that he first advised Defendant he would need back surgery and extended leave on May 29,

2014, during a telephone call he made to Evers from his doctor's office (*Id.* at 364-365 [the "purpose of the call was to let [Evers] know that I was going to be needing a leave"], 365 [advised Evers that leave was "needed and necessary"]). Plaintiff testified that he called Evers to tell him that back surgery "was going to take me out of the game for a while" (*Id.* at 21).

On June 2, 2014, Plaintiff followed up this phone conversation with an email to Evers, which stated the following:

> Concerning our recent discussion last week around my up and coming surgery and scheduling my epidural appointment. The pain management doctor seemed to only have availability on days I'm out of town (go figure). His secretary is working on moving a couple things around to try and squeeze me in on Friday (I'll (sic) trying to make sure she stays away from our scheduled meetings if possible. I'll let you know.)
>
> Also, even though my doctor seemed certain that I should have my vertebrae's fused together; I am seeking a second opinion on the necessity of undergoing massive surgery. I want to be sure I'm not eligible for a less invasive procedure that could help, without the lengthy recovery time. (Cross your fingers for me :-) (Dkt. 22; Ex. L)

On June 3, 2014, Misty Watson, Defendant's Employee Relations Manager emailed Evers and noted that Plaintiff failed to timely provide feedback regarding a customer complaint, despite her having e-mailed him, and asked Evers "[h]as he been demoted at this point?" (Dkt. 22; Ex. M, 6/3/2014 Email between Watson and Evers). In response to Watson's email, Evers noted: "I am giving him the option of resignation or demotion on Monday. Still, this should have been completed by now. I will follow up." (*Id.*).

The following Monday, June 9, 2014, Evers gave Plaintiff the option of resignation with severance pay or demotion to Branch Manager of the Madison

Heights, Michigan branch with a conditional PIP with stairstep goals for 30, 60 and 90 days in that branch (Dkt. 22; Ex. H at 129-130) (Dkt. 22; Ex. N, Plaintiff's PIP). Explaining his decision, Evers testified that the situation in Plaintiff's region eventually got to the point where it was "beyond repair by [Plaintiff]" (Dkt. 22; Ex. H, Evers' Dep. at 110). As a result, Evers, Patrick Goffinet (then Vice President of Field Services), and Ryan Michalowski (then Vice President of Human Resources) made the decision to remove Plaintiff from his Regional Manager position, either by demotion or resignation. More specifically, Evers testified that:

> We had several branches without managers that had left or had been taken out of their position while Matt was there. Performance was trending down. Performance was consistently below company averages and . . . We didn't feel a sense of urgency from Matt to get it turned around and get it fixed, and we did not feel that putting him on a PIP and going another 90 days at that current rate was going to be good for the business. You know, these are multimillion-dollar regions that our regional managers are responsible for (Dkt. 22; Ex. H at 110).

Defendant chose not to place Plaintiff on a PIP as a Regional Manager. Rather, Defendant demoted Plaintiff to managing a single branch office, and immediately placed him on a PIP for his new, lesser, position. The PIP specifically provided: "The Madison Heights branch has been below the company minimum thorough Protection goal of $525 five out of the last six months (ending 5/31/14). The Branch has also been below the company minimum Pulse Conversation Rate goal of 49% every month for the last six months (ending 5/31/14)" (Dkt. 22; Ex. N, p. 1).

Plaintiff testified that when he was offered the option of demotion or resignation, he asked Evers how the Company could take that action when he had a clear record and no previous issues (Dkt. 22; Ex. A at 185). According to Plaintiff,

7

Evers responded: "Do you know what your MPVs were[?]... That's why" (Dkt. 22; Ex. A at 185). Plaintiff testified that "MPVs" was an acronym that Defendant used that meant "goals" and "stands for minimum, primary, visionary" (Dkt. 22; Ex. A at 185). Rather than resigning, Plaintiff accepted the demotion to the Branch Manager position (Dkt. 22; Ex. A at 193, 231-233). In this new position, instead of overseeing Michigan, parts of Ohio and Pennsylvania, Plaintiff now managed a single branch office, and received lower pay (Dkt. 22; Ex. A at 297).

On June 25, 2014, Evers sent Plaintiff an email recapping his performance as branch manager in his first week in that position (Dkt. 22; Ex. O, 6/25/14 Email from Evers). Evers wrote that Plaintiff's "[r]esults were great" and also noted that Plaintiff needed to "[f]ocus on health — Matt is currently dealing with a spinal herniation and needs to get some relief in order to be in the field as much as he should. . ." (Dkt. 22; Ex. O).

Shortly thereafter, on June 27, 2014, Plaintiff advised Human Resources that he had an unexpected increase in his back pain and as a result had to leave the office early (Dkt. 22; Ex. P, 6/27/14 Email from Plaintiff). Three days later, on June 30, 2014, Plaintiff formally requested FMLA leave (Dkt. 22; Ex. Q, FMLA Leave Request).

Plaintiff's request for FMLA leave was granted and Plaintiff was provided with 12 weeks of FMLA leave (Dkt. 22; Ex. A, at 217, 223). On September 30, 2014, after his 12 weeks of leave time had expired, Defendant's benefits administrator, The Hartford, contacted Plaintiff and stated:

8

> As you have exhausted the maximum time available to you, absences beyond 09/30/2014 will not be approved under FMLA and/or state leave, and you will have no more job protected leave available.
>
> Defender Security will be notified of the status of your leave. Please contact your Human Resources department to discuss options available to you if you are unable to return to work (Dkt. 22; Ex. S, 9/30/2014 Letter to Plaintiff).

Subsequently, Plaintiff was granted an extension of his leave (Dkt. 22; Ex. A at 325) (Dkt. 22; Ex. T, 1/21/2015 Letter to Plaintiff).

On January 21, 2015, after Plaintiff exhausted 26 weeks of leave coverage, Defendant contacted Plaintiff and stated:

> Per ou[r] phone conversation on 1/6/2015, our records indicated you will exhaust your additional 26 [weeks of] leave coverage on 1/6/2015. This estimate is based upon all of the leave information provided to Defender as of the date of this letter. Once you have exhausted your remaining time, absences beyond that date will not be approved by the Defender Leave Extension Policy. You will need to reach out to Lindsey Sexton by 1/23/2015 to discuss your return to work options as you have exhausted all leave options available. We will need documentation to support a leave extension if you are unable to return to work. . . if you do not contact Lindsey Sexton by 1/23/2015 . . . we will assume you have resigned from your position at Defender Security Company (Dkt. 22; Ex. T).

Defendant did not receive documentation from Plaintiff supporting an additional leave extension, or any notification that Plaintiff was going to return to his position. As a result, Defendant terminated Plaintiff's employment (Dkt. 22; Ex. T, 2/27/2015 Termination Form).

## II. ANALYSIS

### A. The Standard for Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

9

of law." *See* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff").

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the

10

record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

### B. There Are Genuine Issues of Fact Concerning Plaintiff's FMLA Retaliation Claim

To establish a prima facie case of FMLA retaliation, a plaintiff must show that (1) he or she engaged in an activity protected by the FMLA; (2) the employer knew that he or she was exercising FMLA rights; (3) he or she suffered an adverse employment action; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012). An FMLA retaliation claim accordingly centers around "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason," and "[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (citation and internal quotation marks omitted).

"The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger*, 681 F.3d at 283 (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)); *see also EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (noting that plaintiff's burden of establishing a prima facie case is not an onerous one). The Sixth Circuit has held that "acutely" close temporal proximity

between the protected activity and the adverse employment action "is deemed indirect evidence such as to permit an inference of retaliation[.]" *Id.* at 283–84 (quoting *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004)).

The *McDonnell Douglas* burden-shifting framework apples to FMLA retaliation claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Thus, after the plaintiff establishes a prima facie case of FMLA retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for its action. *Id*. If the defendant sets forth a legitimate, nondiscriminatory reason for the adverse employment action, the burden then shifts back to the plaintiff to establish pretext by showing that the employer's proffered reasons (1) have no basis in fact, (2) did not actually motivate the action, or (3) were insufficient to warrant the action. *See Seeger*, 681 F.3d at 285 (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). The plaintiff "bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant [ ] intentionally discriminated against him." *Id.* (quoting *Clark v. Walgreen Co.*, 424 Fed. App'x. 467, 474 (6th Cir. 2011)). Despite the fact that temporal proximity may be sufficiently close to establish a causal connection in the prima facie case, "temporal proximity cannot be the sole basis for finding pretext." *Seeger*, 681 F.3d at 285 (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012)). "Suspicious timing," however, may be "a strong indicator of pretext when accompanied by some

other, independent evidence." *Id.* (quoting *Bell v. Prefix, Inc.*, 321 Fed. App'x. 423, 431 (6th Cir. 2009)).

The Court finds that Plaintiff has met his minimal burden of proof to establish a prima facie case of FMLA retaliation. Plaintiff testified that on May 29, 2014, he telephoned his supervisor (Evers) from his doctor's office and informed him that he would likely need back surgery and leave time to recover. Plaintiff then followed up this phone conversation with an email to Evers on June 2, 2014. On June 9, 2014 (a week later), Evers gave Plaintiff the option of resigning or accepting a demotion to managing a single branch office. Viewing this evidence in a light most favorable to Plaintiff, the proximity of Plaintiff's invocation of his leave rights and his supervisor's decision to demote him establish a prima facie case of retaliation. "[C]lose temporal proximity between protected conduct and an adverse action may be sufficient on its own to raise an inference of causation." *Benison v. Ross*, 765 F.3d 649, 661 (6th Cir. 2014); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (close temporal proximity "is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation"); *Blosser v. AK Steel Corp.*, 520 Fed. App'x. 359, 363-64 (6th Cir. 2013). Defendant argues that Plaintiff's phone call to Evers from his doctor's office and follow-up email did not say enough to invoke his FMLA protections. Specifically, Defendant asserts that Plaintiff simply flagged his "potential" need for leave in the future, not his immediate need for medical leave. Viewing the evidence in the light most favorable to Plaintiff, Defendant's position is not tenable. Plaintiff

testified that he told Evers that he needed to take actual leave (Dkt. 22, Ex. A, Moore Dep. 365 Line 13) (advised leave was "needed and necessary"). While Plaintiff may not have requested FMLA leave by name, an "employee need not expressly assert rights under the FMLA or even mention the FMLA," 29 C.F.R. § 825.303(b) it is sufficient to give "the employer enough information for the employer to reasonably conclude that an event described in FMLA § [2612(a)(1)(D)] has occurred." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999). The facts here were sufficient to give Defendant enough information to conclude that Plaintiff sought FMLA leave.

Having established a prima facie case, the burden accordingly shifts to Defendant to show a legitimate nondiscriminatory reason for Plaintiff's demotion. Here, Defendant contends that Plaintiff's poor performance was a legitimate reason for his demotion. However, viewing the evidence again in the light most favorable to Plaintiff, it is sufficient to give rise to an inference of retaliation. First, the timing of Plaintiff's demotion—a week after he informed his supervisor that he likely needed leave to have major back surgery—is highly suggestive of a causal relationship. The close temporal proximity suggests that Plaintiff's leave request, not his performance, was the reason his demotion. This is some evidence of pretext.

Temporal proximity, however, is not the only evidence in the record showing pretext; there is also evidence of disparate treatment compared with similarly situated employees. Plaintiff has adduced evidence showing that he was singled out for removal from his position even though he performed better on several metrics

14

than a number of his peers. For example, another regional manager, Sabrina Anderson, was not demoted until November 2014, and only after receiving the opportunity to complete a warning PIP but failing to deliver on it (Dkt. 25; Ex. 11). Plaintiff was demoted without being first placed on a PIP. Furthermore, Plaintiff has presented some evidence suggesting that the Great Lakes region he managed was outperforming peer regions (North Texas, Northern California), while the Regional Managers for those territories were not removed from their positions. In addition, when Evers did take action regarding those Regional Managers, he used PIPs (Dkt. 24, Exs. 11, 12) and coached them (Dkt. 24, Exs. 6-8). Evers admitted during his deposition that regarding Plaintiff, unlike with the other managers, he "did not issue any coaching or disciplinary documents" before removing him from his position (Ex. 9). This evidence allows an inference that Defendant was imposing a higher standard on Plaintiff than on the other Regional Managers.

This record reveals the presence of genuine issues of material fact. Plaintiff has presented sufficient evidence to permit his FMLA claim to go to a jury. Defendant's motion for summary judgment is denied as to Plaintiff's FMLA claim.

## C. There Are Genuine Issues of Fact Concerning Plaintiff's ADA Claim

The ADA prohibits discrimination because of disability against "a qualified individual with a disability," 42 U.S.C. § 12112(a), and defines "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," id. § 12112(b)(5)(A). The Act further defines "reasonable accommodation" to include

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id.* § 12111(9).

As with the FMLA claim discussed above, Plaintiff must first establish a prima facie case of disability discrimination by showing that: (1) he is disabled, (2) he was otherwise qualified for the Regional Manager position, with or without reasonable accommodation, (3) he suffered an adverse employment decision, (4) Defendant knew or had reason to know of his disability, and (5) the position remained open while Defendant sought other applicants or Plaintiff was replaced. *See Ferrari v. Ford Motor Co.*, ___ F.3d ___, 2016 WL 3443646, at *6 (6th Cir. June 23, 2016). "Establishing a prima facie case of discrimination under the indirect method is not onerous." *Id.* (internal quotations and citations omitted). If Plaintiff satisfies this burden, the burden shifts to Defendant to offer a legitimate explanation for its decision to remove Plaintiff from the Regional Manager position. If Defendant does so, the burden then shifts back to Plaintiff, who must introduce evidence showing that the proffered explanation is pretextual. *Id.* (internal quotations and citations omitted).

As with Plaintiff's FMLA claim discussed above, the evidence set forth by Plaintiff is sufficient to meet his minimal burden of proof to establish a prima facie case of disability discrimination. Unquestionably, Plaintiff's back condition was

16

disabling to him. He was otherwise qualified for the Regional Manager position, as he successfully held that job for over three years prior to his demotion. Plaintiff's demotion was an adverse employment decision. Defendant certainly knew about Plaintiff's back condition. And, Plaintiff was replaced by another Regional Manager. These facts establish a prima facie case of disability discrimination.

Defendant's argument that it is entitled to summary judgment on Plaintiff's ADA claim closely mirrors its argument concerning Plaintiff's FMLA claim. That is, Defendant asserts that it had legitimate non-discriminatory reasons for demoting Plaintiff (e.g., his allegedly poor performance) that were unrelated to his disability. To survive a motion for summary judgment, Plaintiff need not definitively prove that Defendant's reason is pretextual, but rather must prove only enough to create a genuine issue as to whether the rationale is pretextual. *See Ferrari, supra*, at *7. As discussed above, there are disputed issues of fact concerning the motivations behind Plaintiff's demotion. Plaintiff has adduced sufficient evidence that he was treated differently than his peer regional managers, thus creating genuine issues that must be resolved by a fact-finder. Therefore, Defendant's motion for summary judgment concerning Plaintiff's ADA claim is likewise denied.

### III. CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment (Dkt. 22) is **DENIED**.

s/Terrence G. Berg<br>TERRENCE G. BERG<br>UNITED STATES DISTRICT JUDGE

Dated: June 28, 2016

## Certificate of Service

I hereby certify that this Order was electronically submitted on June 28, 2016, using the CM/ECF system, which will send notification to each party.

s/A. Chubb
Case Manager